UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

             Plaintiff,

  -vs-                            Case No. 23-CR-10-WMC

KEVIN BRESLIN and
KBWB OPERATIONS, LLC,           Madison, Wisconsin
                                July 31, 2025
                                3:05 p.m.

             Defendants.

_____

STENOGRAPHIC TRANSCRIPT OF TELEPHONIC MOTION HEARING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY
*TRANSCRIBED FROM DIGITAL RECORDING*

APPEARANCES:

For the Plaintiff:

                U.S. Department of Justice
                BY:  KARLA-DEE CLARK
                     STEVEN R. SCOTT
                     ROWAN REID
                Consumer Protection Branch
                450 5th Street, NW, Suite 6400S
                Washington, D.C.  20001

                Office of the United States Attorney
                BY:  AARON D. WEGNER
                Assistant United States Attorney
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

            Jennifer L. Dobbratz, RMR, CRR, CRC
         U.S. District Court Federal Reporter
            United States District Court
          120 North Henry Street, Rm. 410
           Madison, Wisconsin  53703
             (608) 261-5709

APPEARANCES (Continued):

For the Defendant Kevin Breslin:

        Hinshaw & Culbertson LLP
        BY:  KENNETH E. YEADON
           BRIAN ZEECK
        151 North Franklin Street, Suite 2500
        Chicago, Illinois  60606

For the Defendant KBWB Operations, LLC:

        Chiesa Shahinian & Giantomasi PC
        BY:  MELISSA I. FALK WERNICK
        105 Eisenhower Parkway
        Roseland, New Jersey  07068

Also appearing:   KEVIN BRESLIN, Defendant
                MARIAH STIEVE, U.S. Probation Officer

                    ***

12    (Proceedings called to order at 3:05)

13       THE COURT:  All right.  I am calling Case No.

14  23-CR-10-01 and -02, Kevin Breslin being the defendant in one

15  and the company being the defendant in the other, and I'll hear

16  appearances first for the government.

17       MS. CLARK:  Good afternoon, Your Honor.  Karla-Dee

18  Clark, Rowan Reid, Steven Scott, and Aaron Wegner on behalf of

19  the United States.

20       THE COURT:  All right.  And I'll assume that, for

21  purposes of this hearing, responses by the government will be by

22  Ms. Clark.  Anyone else who wishes to speak will just need to

23  identify themselves for the record.

24    I'll hear appearances then for Mr. Breslin.

25       MR. YEADON:  Good afternoon, Your Honor.  Ken Yeadon,

1    Brian Zeeck, and Mr. Breslin are here before the Court.

2         THE COURT:  And we'll follow the same proceeding, which

3    is that if I call on the individual defendant, I'll assume it's

4    Mr. Yeadon speaking, unless someone else identifies themselves

5    for the record.

6         And, finally, for the company, KBWB Operations, I'll hear

7    appearances.

8         MS. WERNICK:  Good afternoon, Your Honor.  This is

9    Melissa Wernick from CSG Law for KBWB.

10        THE COURT:  Very good.  There won't be confusion as to

11    who's speaking then for KBWB.

12        And with that, I'll just explain that I am holding this

13    hearing because of what sometimes occurs and often is not

14    addressed in order for me to be fully informed at sentencing is

15    a tremendous difference in the perspective of the government and

16    the defendants as to the range of the actual loss as well as an

17    appropriate restitution amount.  And I don't know how I can

18    adequately proceed without a much better understanding of those

19    matters because the guideline range would dramatically change

20    depending upon which version of the facts I ultimately accept,

21    as has been just recently addressed by the -- again, by the

22    probation officer, who, for the record, I understand is also on

23    the line.

24        Officer Stieve, you are with us?

25         OFFICER STIEVE:  Yes, Your Honor.

1          THE COURT:  So that's where we stand as a court, and

2     I'm looking for some guidance from counsel as to what we can

3     practically do to proceed, with my assumption being that the

4     parties are so far apart, a determination of CMS losses, any

5     individual victim losses, and the IRS losses are necessary for

6     me to meaningfully impose sentences here.

7          I assume the government doesn't disagree that you and the

8     defendants are not able to agree on any of those three numbers,

9     much less the restitution numbers here.

10          MS. CLARK:  That's correct, Your Honor.

11          THE COURT:  So my question is when would the government

12     be ready to proceed to prove those matters up to me?

13          MS. CLARK:  Your Honor, we would be ready to proceed on

14     the restitution amounts we would say, as in our motion, anytime

15     after the end of September.  We do have the amounts for the IRS,

16     and we do have the amounts for CMS.  It's the individual victims

17     and businesses that we are still finalizing and reviewing.

18          THE COURT:  So, if I could, does that mean that you

19     currently have amounts in terms of total losses for CMS and for

20     the IRS, and you're prepared to prove up --

21          MS. CLARK:  Yes, Your Honor.

22          THE COURT:  Let me finish my question.  You're prepared

23     to prove up those now?

24          MS. CLARK:  Yes, Your Honor.

25          THE COURT:  And as for victim losses, do you have a

1    general amount that you're able to prove up?

2    MS. CLARK:  We have an estimate amount, and it's just a

3    very rough estimate amount.  We've received 143 claims that

4    total approximately $2.6 million.  We also received one

5    additional claim from a company that totals about $40 million

6    for an approximate total of $43,534,000.

7    THE COURT:  All right.  Then I'll turn to counsel for

8    the individual defendant, Mr. Breslin.

9    Are you ready to respond to the government's asserted

10    losses to CMS and the IRS?

11    MR. YEADON:  Your Honor, we are.  We'll be addressing

12    that in our sentencing memo.  However, the victim losses are

13    necessary -- it is necessary to know the timing of the victim

14    losses in order to respond to the CMS and the tax loss for the

15    following reason:  The victim losses, we believe, will mostly be

16    in 2018, and that supports our argument, which we have made in

17    the objections to the PSR, that the real harm here is in 2018

18    and that, therefore, the Court should, in calculating the loss

19    amount, limit it to 2018.

20    Because we do not have all the victim loss information yet

21    and we do not expect it to be -- to receive it until the end of

22    September, we have moved the Court to continue the sentencing

23    hearing until we have that information.

24    THE COURT:  My confusion has to do with your request to

25    delay with the distinct possibility of a substantially higher

1    overall loss because we'll be adding in the victim losses.  At

2    this point the probation office is calculating the guidelines

3    without including those losses, but, nevertheless, you claim

4    they have -- and I'm having trouble understanding the

5    interrelationship between CMS losses, which is claimed to be a

6    lack of return on the payments for services, and the victims'

7    losses, although I guess I gather the general reason is that if

8    the victims were receiving services, then the CMS amount should

9    be reduced to the extent those services were actually being

10   provided and paid for by the government.

11        Have I got that approach basically right?

12             MR. YEADON:  I would add, Your Honor, that the -- the

13   government's -- what Mr. Breslin's pled guilty to is diversion

14   of funds, diversion of CMS funds, and those diversion of those

15   funds were diverted away from the victims, meaning the vendors,

16   the residents, and the employees so --

17             THE COURT:  But that by itself would be a loss,

18   wouldn't it, to CMS, never mind the victims?

19             MR. YEADON:  It would, but I think it's -- I want to

20   argue to the Court that because most of the victim losses are in

21   2018, that the CMS loss should be limited to 2018 because that's

22   when the funds were diverted and not paid to the victims.

23             THE COURT:  So it sounds like you're prepared to

24   proceed on your general theory as to losses by CMS and by -- and

25   to the IRS.

```
1              MR. YEADON:  I -- respectfully --

2              THE COURT:  To the extent that your -- hang on.  To the

3    extent that your principal argument -- and I assume I'm speaking

4    to Mr. Wegner -- that your principal --

5              MR. YEADON:  No --

6              THE COURT:  -- argument is the period of time in which

7    services were not being provided.

8              MR. YEADON:  Your Honor, this is Mr. Yeadon for --

9              THE COURT:  I apologize.  So this is Mr. Yeadon

10   speaking.  I appreciate it.

11             MR. YEADON:  Yeah.  Your Honor, we're not prepared to

12   proceed on the CMS losses because we believe the victim losses,

13   you know, the timing of when those losses took place, will be

14   helpful for us to understand, explain to the Court, when the CMS

15   losses took place.

16        What I don't want to do is to get into a restitution

17   hearing in October and find out that many of the victim losses

18   were from 2018 and that if those -- if those victims -- and if

19   the CMS money had not been diverted in 2018, those victims would

20   not have lost money -- in fact, there are very few victims for

21   the prior years -- because then I would not have had the chance

22   to argue to the Court next week at sentencing that the loss

23   amount from CMS should not include years prior to 2018.

24             THE COURT:  Well, let me ask the government, are you

25   prepared to proceed on the -- proving up the victim losses that
```

1   you have to date for purposes of arriving at an appropriate

2   guideline range for sentencing?  Understanding that you may

3   still need some time for a supplementation by others with

4   respect to the restitution amounts, are you prepared to proceed,

5   as to the calculation of guidelines, with the victim losses that

6   you have now documented to date?

7           MS. CLARK:  Yes.  We're prepared to proceed with the

8   victim losses for CMS and IRS --

9           THE COURT:  I didn't ask you that.  That's the second

10  question.

11      The first question:  Are you prepared to proceed with the

12  calculation of the guideline range based on the victim losses

13  that you've documented to date?

14          MS. CLARK:  Yes.

15          THE COURT:  And have you provided those -- the

16  information that you have to defendants?

17          MS. CLARK:  Yes.

18          THE COURT:  So I'll come back to you, Mr. Yeadon.

19      If you have all the information that you need with respect

20  to the victim losses being claimed for purposes of both those

21  victims and for CMS and for the IRS, why can't we proceed to

22  make that determination in an evidentiary hearing?

23          MR. YEADON:  I don't.  I have not received the victim

24  information, Your Honor.  I've been told there are 144, and thus

25  far, I've received 14.  I have not seen this $40 million claim.

1    And, Your Honor, I'll --

2         THE COURT:  Hang on.  Hang on just a moment.  Then I'm

3    going to go back to the government.

4    Ms. Clark --

5         MS. CLARK:  Yes.

6         THE COURT:  -- have you provided more than the 14

7    victims' information yet?

8         MS. CLARK:  No, just the 14 victims' information we

9    have provided so far, Your Honor.

10        THE COURT:  And are you willing to stand on just those

11   14?

12        MS. CLARK:  For purposes of the guidelines, yes.

13        THE COURT:  But the argument -- what's wrong with the

14   argument by defendants that they need to know the range of dates

15   in a broader group of victims before they can agree on an

16   appropriate amount even for CMS losses?

17        MS. CLARK:  Because the two don't relate.  They don't

18   correlate to each other.  The remaining outstanding victim

19   claims are from vendors and businesses with unpaid or only

20   partially paid bills, employees who are claiming bills for

21   medical expenses not covered by their insurance --

22        THE COURT:  So what do the 14 --

23        MS. CLARK:  -- and --

24        THE COURT:  -- represent that you do have information

25   on?

1        MS. CLARK:  Those are 14 that we were able to finalize,

2    primarily businesses who have submitted claims that we were able

3    to finalize for unpaid or not fully paid bills for services

4    provided.

5        THE COURT:  And you're willing to agree that that

6    range, whatever that ends up being, is enough to represent the

7    CMS loss, even though -- I guess, more accurately, you don't

8    think they're interrelated as long as you can establish CMS's

9    payments for those businesses or that should have gone to those

10   businesses.

11       MS. CLARK:  Those -- the CMS payments would not have

12   gone to those businesses.

13       THE COURT:  No, I understand that.

14    I feel as though the parties are talking past each other.

15   I'm trying to get your ships to at least be on the same track.

16   I understand there's a disagreement as to what the outcome would

17   be of a collision, but I need you to engage with Mr. Yeadon's

18   argument that the best evidence of the period in which losses

19   were incurred by CMS is when victims were not being paid.

20       MS. CLARK:  The government disagrees --

21       MR. SCOTT:  Your --

22       THE COURT:  Hang on.  Mr. Yeadon, you're going to get

23   another chance.  I won't close this hearing until everyone has

24   had an opportunity to address my questions.  I'd just ask you to

25   wait because we're making a record here, and right now --

```
1              MR. SCOTT:  Judge --

2              THE COURT:  -- I'm asking counsel for the government to

3    respond to my question.

4         And, Ms. Clark, you should proceed.

5              MS. CLARK:  Your Honor, the government believes the

6    period is well before 2018 -- started in 2015, and there are

7    losses between 2015 and 2018 -- and disagree that the bulk of

8    the losses were in 2018.

9              THE COURT:  All right.  And how are you prepared to

10   prove losses before that time, before 2018?  What will be your

11   evidence?

12             MS. CLARK:  Is this regarding CMS, Your Honor?

13             THE COURT:  I think it is principally, but we're

14   also --

15             MS. CLARK:  That's fine.

16             THE COURT:  -- going to talk about victims.  So let's

17   stick with CMS.

18        How are you going to prove that they were not getting what

19   they were paying for earlier than 2018?

20             MS. CLARK:  That's fine.  I just would like to -- I

21   believe my co-counsel, Mr. Scott, will address that.

22             THE COURT:  That's fine.

23        Mr. Scott, go ahead.

24             MR. SCOTT:  Thank you, Judge.  And just a moment ago,

25   that was me that was trying to jump in because I was
```

```
 1     preparing -- it was not Mr. Yeadon --
 2               THE COURT:  Understood.
 3               MR. SCOTT:  -- just so the record is clear.
 4               THE COURT:  All right.
 5               MR. SCOTT:  Thank you.
 6               THE COURT:  Go ahead.
 7               MR. SCOTT:  So, Judge, and maybe it's helpful, for the
 8     most part, the government's theory of loss on the CMS mirrors
 9     probation's.  So, in effect, our theory is that every single
10     dollar that Medicare and Medicaid paid to the 23 Atrium
11     Wisconsin facilities constitutes the loss in this case, so it
12     really --
13               THE COURT:  Understanding that, how do you intend to
14     prove that?
15               MR. SCOTT:  Through case -- in our sentencing
16     memorandum, through case law, through claims data I think
17     sufficiently will establish that that should be the loss.
18               THE COURT:  So then I'll come back to you, Mr. Yeadon.
19          Why isn't that evidence sufficient?
20               MR. YEADON:  Because it does not show that, in fact,
21     the money that came from CMS and should have gone to the
22     facilities, you know, in fact, didn't and that the time frame of
23     that is proven up by the vendors and the residents who have
24     made -- who have submitted claims to the government for
25     restitution.  Thus far --
```

1          THE COURT:  Mr. Scott -- back to you, Mr. Scott.

2      So he's saying the mere fact of payment by CMS without

3  evidence that those payments didn't go to providing services is

4  insufficient to establish loss.

5          MR. SCOTT:  Well, then we disagree on the theory and

6  the case law.

7          THE COURT:  Well, help me understand.  Under your

8  theory, why is CMS out that money if it's not clear that it

9  wasn't used to provide services?

10          MR. SCOTT:  Sure.  So CMS only reimburses claims that

11  meet -- in this case, the relevant standard would be the

12  acceptable standards of medical practice.  Our theory and what

13  the evidence shows is that really from the outset, defendant

14  Breslin, along with KBWB, had a scheme to siphon money away from

15  the Wisconsin facilities for their own enrichment.  If Medicare

16  would have known that that was their scheme and their -- that

17  was their scheme, they would not have approved KBWB as a

18  Medicare provider.  They would not have reimbursed any claims.

19  And the argument that, you know, some services -- some services

20  were provided over the course of a number of years is not the

21  relevant inquiry.

22      The relevant inquiry is whether or not Medicare would have

23  reimbursed those claims that were submitted if Medicare knew how

24  the operation was being run and siphoning out $81 million over

25  the course of less than 4 years causing, as defendant Breslin

1    told the Court under oath at his plea hearing, causing the

2    medical care provided to fall below the federally mandated

3    standards of care resulting in the entire operation being a

4    scheme by defendant Breslin and KBWB to enrich themselves at the

5    risk of harming residents, and, therefore, every single dollar

6    is fraud.  And the law further --

7              THE COURT:  Whether or not some services were provided.

8              MR. SCOTT:  Exactly.  Because it's not about whether

9    services were provided.  It's whether the claims were

10   legitimate, and based on the totality, these claims were not

11   legitimate because the acceptable standards of medical practice

12   were not being met.

13             THE COURT:  Well, that at least gives us a collision

14   for me to make a decision in terms of the loss amounts based on

15   the acceptance of the -- one of the two sides' view of losses

16   for CMS and IRS, and if I understand it correctly, those are the

17   only losses on which the probation office is calculating the

18   guideline range.  But I'll hear from you again, Mr. Yeadon, if

19   there's anything else you think -- or why anything else is

20   required, since the theories of loss are just different.  I

21   either accept the government's version, or I accept your

22   version, or at least the possibility of your version, and then

23   the loss will be far lower.

24             MR. YEADON:  Your Honor, the theory is that the entire

25   thing is a fraud, and thus far, I've only seen 14 claims, most

1    of which are from 2018.  I've not seen anything from 2015, 2016.

2    I've seen one from 2017 --

3    THE COURT:  You seem to be missing the point.  They're

4    claiming it doesn't matter if the residents were getting

5    services.  What matters is that your client had misrepresented

6    how monies were being applied, and so it doesn't matter that

7    ultimately perhaps some victims got services.  What matters is

8    that you had falsely used -- your client and its company -- his

9    company had falsely represented what the monies that were being

10    paid were going to.

11    MR. YEADON:  Their theory is that the claims would not

12    have been paid if CMS knew the money wasn't going back to the

13    facilities to provide services like vendors, residents --

14    THE COURT:  Right.

15    MR. YEADON:  -- and others, and I have not seen -- my

16    argument is that if -- it happened, Judge, because he pled

17    guilty to it, but it happened in 2018.  I haven't seen anything

18    from the prior years, and that's why I want this victim

19    information so that I can argue to you, Judge, that the loss

20    amount should be, you know -- the loss amount should be limited

21    to 2018, which is a much lower amount -- which is a much lower

22    number.

23    THE COURT:  And you can certainly make that argument,

24    and if that's the proper measure and that the government hasn't

25    met its burden of showing a higher loss because legally they're

```
 1      not entitled to recoup all of the payments that were made
 2      because of diverted funds, you can make that argument, and I'll
 3      have to decide which of those arguments I agree with.  I can
 4      even assume, as you do, that most of the victims -- individual
 5      victims' losses occurred in 2018.  That just bolsters your
 6      argument if you're right on how the loss is properly calculated,
 7      but I don't know that it requires us to delay anything because
 8      the only losses that are being claimed by the government are on
 9      a theory that you simply disagree with.  So I'll have to decide
10      which side is correct.
11              MR. YEADON:  I can't make my argument in full, Your
12      Honor, without all the information, and I won't have it until
13      after -- until September.
14              THE COURT:  Let's assume, for purposes of the
15      sentencing, that the vast majority of victims' complaints will
16      be coming from 2018.  Why can't you make your argument?
17              MR. YEADON:  I can, Your Honor.  I --
18              THE COURT:  So that's what we will --
19              MR. YEADON:  I --
20              THE COURT:  That's what the Court will be assuming, and
21      I understand the government is going to live with that
22      assumption.
23          Is that correct, Mr. Scott?
24              MR. SCOTT:  (No response.)
25              THE COURT:  For purposes of sentencing and the loss
```

1   here, you're going to accept that most of the victim losses

2   occurred in 2018.  I should say the -- yeah, victim losses,

3   other than CMS.

4            MR. SCOTT:  I guess, Your Honor --

5            THE COURT:  The individual victims.

6            MR. SCOTT:  Right.

7            THE COURT:  The vendors, the employees --

8            MR. SCOTT:  The --

9            THE COURT:  -- others, most of those losses took place

10   in 2018.  You're going to -- you're not going to dispute that

11   for purposes of sentencing.

12            MR. SCOTT:  I'm going to -- if you don't mind, Your

13   Honor, I'm going to defer to Ms. Clark.  The only thing I would

14   add on that is the government's theory of the CMS loss is not

15   dependent upon individual claims.  That would be under relevant

16   conduct, but --

17            THE COURT:  Why isn't --

18            MR. SCOTT:  -- I'll ask Ms. Clark to --

19            THE COURT:  Why isn't that what I just said?

20            MR. SCOTT:  (Unintelligible) --

21            THE COURT:  For purposes of losses -- hang on.  For

22   purposes of calculating the losses under the guidelines, you

23   will not be disputing that the majority of those losses by the

24   individual vendors occurred in 2018.  You will be arguing that

25   CMS's losses occurred well before then.

```
1           Have I got that right, Mr. Scott?  Subject to any gloss
2      Ms. Clark wants to put on it.
3                MR. SCOTT:  Yes.
4                THE COURT:  Ms. Clark?
5                MS. CLARK:  I don't think I have anything to add to
6      that, Your Honor.  I just want to note for the record that under
7      the government's theory, any victim -- individual or business
8      victim losses would not be relevant.  I know that's different
9      from the defense, but then the answer to your question is yes,
10     with that caveat.
11               THE COURT:  But you're willing to live with the
12     assumption that to the extent they have any relevance, those
13     losses by individual victims occurred in 2018.
14               MS. CLARK:  Yes.
15               THE COURT:  All right.  Back to you, Mr. Yeadon.
16     What am I missing?
17               MR. YEADON:  The prior years, Your Honor, which is a
18     lot of money for loss purposes.  I --
19               THE COURT:  But they're not depending on the victim --
20     on the timing of the victims' losses, individual victims'
21     losses, for those years.  You're getting what you claim may be
22     produced by individual victims.  You're getting that
23     stipulation.  I'm having trouble understanding, with that
24     stipulation, why you're not willing to proceed with sentencing.
25               MR. YEADON:  Because for the prior -- their theory is
```

1    that -- I'll let Mr. Zeeck jump in here too if he wants.  Their

2    theory is that it was -- the whole thing was a fraud from 2015

3    to 2018.

4              THE COURT:  Exactly.

5              MR. YEADON:  Now -- so we've got 2018 now that they're

6    agreeing that the victims -- I think -- the thing is I don't

7    know, Your Honor, what the other victims' statements will show.

8    Will there be nothing from --

9              THE COURT:  We're assuming -- Mr. Yeadon, you can't get

10   around this.  We're assuming that they're going to show those

11   losses occurred in 2018 as well.  You're getting the benefit of

12   the assumption without having to prove it, so why are we waiting

13   on sentencing?  You just have a --

14             MR. YEADON:  I'm sorry --

15             THE COURT:  You have a radically different assumption

16   about how losses are calculated in this case, but you're getting

17   the benefit of the facts to make your argument as to how it

18   should be calculated.

19             MR. YEADON:  All right, Your Honor.

20             THE COURT:  I'm sincerely asking you, what am I

21   missing?

22             MR. YEADON:  I understand that we're getting the

23   benefit of the assumption.

24             THE COURT:  All right.  Mr. Zeeck, did you want to add

25   anything to that?

1          MR. ZEECK:  No, Judge.  Sorry.  No, Judge.

2          THE COURT:  And, Ms. Wernick, anything you want to add

3     for your client?

4          MS. WERNICK:  No, Your Honor.

5          THE COURT:  All right.  Then I don't think there's any

6     reason to delay the sentencing, but I do want to hear from the

7     probation officer before we close this hearing.

8       Officer Stieve, is there anything more that you need

9     clarification on?  Understanding that restitution is going to

10    have to wait until a hearing after September.

11      Ms. Stieve, do we still have you?  You might have a mute

12    on.

13         OFFICER STIEVE:  Yeah.  Sorry, Your Honor.  I was on

14    mute.

15         THE COURT:  That's fine.  Go ahead.

16         OFFICER STIEVE:  Is Your Honor proposing an evidentiary

17    hearing for the loss amount?

18         THE COURT:  No, not for the loss amount --

19         OFFICER STIEVE:  Okay.

20         THE COURT:  -- because it will turn on a legal question

21    for the Court.  As I understand it, you've assumed that the

22    entire payment by CMS are losses for the period between 2015 and

23    2018, and that will be the correct number, unless defendants are

24    able to convince me that it's the individual victims were not

25    harmed until 2018, which is the assumption here, and that,

1    therefore, those earlier losses shouldn't be counted as losses.

2         OFFICER STIEVE:  Okay.  I have no other questions then.

3         THE COURT:  All right.  I'll give everyone one last

4    chance.

5       Anything more for the government today?

6         MS. CLARK:  No, Your Honor.

7         THE COURT:  Same question for the defendants, beginning

8    with Mr. Breslin's counsel.

9         MR. YEADON:  No, Your Honor.  Ken Yeadon.  No, Your

10   Honor.

11        THE COURT:  Or for KBWB Operations.

12        MS. WERNICK:  No, Your Honor.

13        THE COURT:  All right.  Then I will see you for

14   sentencing as presently scheduled, and I will give you a date

15   and time -- in fact, I may have my assistant follow up for a

16   date and time for the restitution hearing to be established in

17   advance of sentencing as well, and we are adjourned for the day.

18      Thank you, all.

19        MR. YEADON:  Thank you.

20        MS. WERNICK:  Thank you.

21      (Proceedings concluded at 3:36 p.m.)

22                              ***

23

24

25

1    I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that the

3    foregoing is, to the best of my ability, a true and accurate

4    transcription of the digitally-recorded proceedings held on the

5    31st day of July, 2025, before the Honorable William M. Conley,

6    U.S. District Judge for the Western District of Wisconsin.

7        Dated this 14th day of August, 2025.

8

9

10

11

12

13                              _____/s/ Jennifer L. Dobbratz_____

14                              Jennifer L. Dobbratz, RMR, CRR, CRC
                                        Federal Court Reporter
15

16

17

18

19

20

21

22

23

24        The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless under
25   the direct control and/or direction of the certifying reporter.